**FILED**
**Aug 22, 2023**
**03:21 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Savitri Matthews | ) Docket No. 2021-06-1175 |
| | ) |
| v. | ) State File No. 118458-2019 |
| | ) |
| Family Dollar Stores | ) |
| of Tennessee, LLC, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Kenneth M. Switzer, Chief Judge | ) |

---

### Affirmed and Certified as Final

---

The employee reported suffering a mental injury when a man with a weapon entered the store where she was working and held her at gunpoint during the course of robbing the store. The employer accepted her claim as compensable, and the employee received treatment from an authorized treating psychiatrist who later assigned an impairment rating and restrictions. Two other psychiatrists also assigned impairment ratings, one of which was a physician selected from the Bureau of Workers' Compensation's Medical Impairment Rating Registry. Following a compensation hearing, the trial court concluded the employee sustained an impairment consistent with the impairment rating assigned by the authorized treating physician and the doctor selected from the registry. The court also determined that the employee's wage rate at the end of the initial benefit period was not equal to or greater than her pre-injury wage rate and that she was, therefore, entitled to increased benefits. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's order and certify it as final.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Meredith B. Weaver joined.

Tiffany B. Sherrill, Knoxville, Tennessee, for the employer-appellant, Family Dollar Stores of Tennessee, LLC

Jonathan May, Memphis, Tennessee, for the employee-appellee, Savitri Matthews

## Factual and Procedural Background

Savitri Matthews ("Employee") worked as a store manager for Family Dollar Stores of Tennessee, LLC ("Employer"). On October 16, 2019, she was working as a cashier when a man entered the store with a weapon and held her at gunpoint during the course of robbing the store. Employee testified that when the gunman heard her coworkers working in other parts of the store and realized she was not alone, he cocked his weapon and demanded that they come to the front of the store.[1] Employee further testified that after she gave the gunman money from the register, he left. She then closed the store, called the police, and contacted her manager to report the incident.

Employee returned to work two days after the incident. She testified that although she continued working for approximately a month, she was "jumpy" and would keep the store locked when she was by herself. She stated she would yell at customers to take their hands out of their pockets and was apprehensive of male customers wearing hoodies.[2] Employee eventually reported these issues to Employer and was seen by a counselor. Employee was not provided with a panel of mental health providers, but the counselor assigned work restrictions and eventually recommended further treatment with a psychiatrist.

At Employer's direction, Employee was seen by Dr. Greg Kyser, a psychiatrist who provided treatment, prescribed medication, and restricted Employee from working. Employee testified that she initially saw Dr. Kyser every two weeks, but those visits became less frequent as her symptoms improved. Dr. Kyser placed Employee at maximum medical improvement ("MMI") on April 20, 2021, assigned a ten percent impairment rating, and restricted her from working in retail or in positions that require interacting with the general public.

Subsequently, at Employer's request, Employee underwent another psychiatric evaluation by Dr. Stephen Montgomery in June 2021. He assigned a five percent permanent impairment rating but indicated that only one-half of that impairment arose primarily from the work incident. Due to the disparate ratings, Employee was evaluated in May 2022 by Dr. Melvin Goldin through the Bureau of Workers' Compensation's Medical Impairment Rating Registry ("MIRR"). Dr. Goldin assigned a ten percent impairment rating.

---

[1] Employee testified that she pushed the panic button as soon as the gunman entered the store, thinking that "by the time I get this money in, somebody'll be there." She later discovered that the store's panic button was not operational.

[2] Employee also testified that the robber later returned to the store in his vehicle and, upon seeing Employee in the parking lot, stated, "I should have shot you." She also reported that the robber followed her in his car one night after work, and she had to seek help from a police officer on patrol.

After attaining MMI, Employee did not return to work for Employer. As a store manager, Employee had earned an annual salary of $51,500.00 and did not receive pay for overtime work.[3] Following the injury, at some point in 2020 and 2021, Employee performed some consulting work in human resources for two clients. She obtained a loan of $17,000 during that time from the Paycheck Protection Program, which she testified was used to pay the wages of two employees of that business. According to Employee, she did not make any income from this business.[4] Employee testified she returned to the workforce in January 2022 and, by March 2022, she was earning $22.00 per hour working from home for HCA in human resources. She testified that although paystubs reflected payment for overtime work, HCA no longer permitted overtime after March 2022. Following her employment there, she went to work for The Gap in a temporary human resources position. At the time of trial, she still worked for The Gap but had moved to a warehouse position filling orders.[5]

Based on evidence submitted by Employer at trial, the armed robbery at work and the subsequent interactions with the robber were, unfortunately, not the only traumatic events in Employee's life. Prior to the work incident, Employee was diagnosed with cancer in 2014 and underwent treatment for that condition. Also, Employee reported that a close family member had molested her teenage daughter in 2018.[6] Employee acknowledged that she had experienced financial struggles and had filed for bankruptcy two weeks prior to the robbery. Moreover, following the work incident, Employee's home was destroyed by a tornado in March 2020, and both she and her daughter were inside the home at the time. She and her daughter subsequently moved in with her mother, whom she witnessed suffer a heart attack shortly thereafter. In October 2020, Employee's twenty-year-old son died unexpectedly. That same month, Employee was involved in a major car accident and had a stroke that resulted in a week-long stay in an intensive care unit. Employee maintained at trial that she only attended two grief counseling sessions after her son's death in 2020 but denied that she sought or received any other type of therapy, counseling, or psychiatric treatment for any of the other events noted above.

Employee testified that the robbery's impact on her mental health was different from the impact of other traumatic events in her life because the gunman made an intentional

---

[3] Employee testified that she worked between 50 and 70 hours per week.

[4] Employee also started a non-profit called "The Savi Rose Foundation," although the timing of that endeavor is unclear in the record. She testified she never raised money for the non-profit and did not earn any income from the non-profit.

[5] Employee testified that The Gap offered to advance her position in Human Resources if she could work as a liaison, but she declined because the position would have required her to interact with the public. According to her testimony, Employee was earning $16.65 per hour in the warehouse position.

[6] Employee testified the family member was ultimately tried for his crimes in March 2023, and her daughter testified at the trial.

choice to hold her at gunpoint and frighten her repeatedly. She maintained that he is "a criminal" and has "been arrested twenty-one times for armed robbery" since the incident.[7] Employee testified that she is now a more fearful person and has moved to a gated community. She is afraid of large groups of people and generally does not leave home unless accompanied by a family member. Employee testified that she has nightmares frequently, including "waking up to the sounds of the gun being cocked."

Drs. Kyser, Montgomery, and Goldin testified by deposition. Dr. Kyser, who was not selected from a panel in accordance with Tennessee Code Annotated section 50-6-204(a)(3), was Employee's authorized treating physician and is a board-certified psychiatrist with 30 years' experience. He testified that he is "certified as an expert" in using the American Medical Association's Guides to the Evaluation of Permanent Impairment ("AMA Guides") to assign impairment ratings for mental injuries and that approximately one-third of his practice is comprised of workers' compensation patients.

Dr. Kyser first saw Employee on January 30, 2020, upon referral from Employer's insurer, and diagnosed Employee with "post-traumatic stress disorder with some depressive components." Dr. Kyser noted that Employee's difficulties were directly related to her work injury and testified that "were it not for the events of work . . . those symptoms would not be present." He concluded that the work event was the primary cause of Employee's symptoms. Dr. Kyser treated Employee over an extended period and noted she continued to have "concerns for her personal safety" and was "hypervigilant" after the robbery. He eventually placed Employee at MMI on April 20, 2021, and later assigned restrictions of no working in retail or in any business position "having to deal with the general public." Dr. Kyser assigned a ten percent permanent impairment and provided the following explanation for his methodology in reaching that rating:

Under the guidelines of the Sixth Edition . . . there are three psychiatric rating scales that are administered to the patient, and each of those have – yields a percentage impairment rating. And of those three, you take the median score or the middle score.

. . . .

And on all of those scales, in looking at the appropriate tables, those would all yield 10 percent impairment, it's ten, ten, ten the median score being ten. So that's the final impairment rating.

Dr. Kyser opined that the entirety of Employee's permanent impairment was primarily caused by the work-related event and recommended continued treatment for Employee's mental condition. He testified that he had reviewed Dr. Montgomery's

---

[7] There is no evidence in the record corroborating these statements.

4

deposition and was of the opinion that, contrary to Dr. Montgomery's apparent experience with Employee, she was transparent with the history she provided him, and he did not find her to be evasive or uncooperative. Dr. Kyser testified that he had considered stressors from Employee's history prior to the work incident as well as stressors that occurred after the work incident. Even taking those other events into consideration, he opined, to a reasonable degree of medical certainty, that the work-related incident was greater than fifty percent of the cause of Employee's post-traumatic stress disorder ("PTSD") and resulting permanent mental impairment.

During cross-examination, Dr. Kyser was asked if he believed there was an inherent conflict in being an injured employee's treating psychiatrist and providing expert testimony on behalf of that employee. In response, Dr. Kyser stated that he was providing his opinion regarding his medical services and Employee's mental health condition. He noted there are only "a handful of psychiatrists in Tennessee that practice workers' comp[ensation] and that know how to do this." In addition, he testified that he is required by the dictates of the AMA Guides to address impairment when he places patients at MMI. He stated that his credibility as well as the weight of his opinion are factors for the trial court to consider. Finally, Dr. Kyser testified that he was not aware of "any evidence [Employee] was suffering from PTSD at the time of her injury" and noted that, although he agreed with Dr. Montgomery's diagnosis, he disagreed with his opinion regarding how Employee's impairment should be apportioned between the injury and other possible causes.

Dr. Montgomery also utilized the methodology set out in the AMA Guides but concluded Employee sustained a five percent impairment rating. In considering Employee's pre-existing or subsequent "psychiatric traumatic events," he apportioned one half of her impairment to the work incident and one half to other stressors in her life. Dr. Montgomery noted that Employee described being in a "deep, dark place" when she was diagnosed with cancer in 2014, and he believed she still had some anxiety related to the cancer and other psychological stressors she identified during his evaluation. He testified that this apportionment was based on his medical judgment rather than charts or tables, and he opined Employee retained a two-and-a-half percent impairment as a result of the work incident.

Dr. Goldin, the MIRR evaluating psychiatrist, testified he has practiced for over thirty years and has treated only workers' compensation patients for the last ten years. Dr. Goldin also used the methodology prescribed by the AMA Guides and, like Dr. Kyser, assigned a ten percent impairment rating. When questioned about the rating he assigned, Dr. Goldin conceded it was possible Employee could have had a psychiatric impairment prior to the incident, but he stated he could not testify to this within a reasonable degree of medical certainty. Dr. Goldin also responded in the negative when Employer questioned whether he could say, within a reasonable degree of medical certainty, that the ten percent impairment rating he assigned would be based solely on the work injury. However, when asked by Employee's counsel if "to a reasonable degree of medical certainty . . . the

impairment rating [that he] submitted to the state in [the] MIR report . . . [was] correct," he responded "yes, with the caveat that there are factors, which if I had access to more data, might have altered [my evaluation]."[8]

At the conclusion of the compensation hearing, the trial court determined that all three physicians practice the same specialty, are well-qualified, and agreed that the diagnosis of PTSD arose primarily from the robbery at work. In addition, the court noted that all three providers utilized the same methodology stated in the AMA Guides to calculate their ratings. The court noted that the AMA Guides suggests that a treating provider generally avoid serving as an expert witness on behalf of a patient "mainly because it could be detrimental to their therapeutic relationship," but the court commented that both Dr. Kyser and Employee were aware he would be asked to testify in this instance. In addition, the court observed that Dr. Kyser was required to assign an impairment rating pursuant to Tennessee Code Annotated section 50-6-204(k)(1).

With regard to Dr. Montgomery's opinion, the court found that, in apportioning his rating, he improperly considered subsequent traumatic events instead of reducing the overall impairment only by the degree of preexisting impairment. As a result, the court concluded Dr. Montgomery "improperly considered events such as the tornado, [Employee's] son's death, and the car accident in assessing the apportionment, making his opinion less reliable." Further, he did not assign any specific impairment rating to the alleged preexisting traumatic events and did not suggest that Dr. Goldin had used an incorrect methodology when calculating his impairment. Thus, the court concluded that the opinions of Dr. Montgomery did not raise serious or substantial doubt about the accuracy Dr. Goldin's rating."[9]

In sum, the court noted that it relied on two medical opinions that carry presumptions of correctness. It also found Employee's testimony credible and found that Employee sustained a ten percent permanent partial impairment as determined by Dr. Goldin. Finally, the court found that Employer did not rebut the presumption of correctness attached to Dr. Goldin's rating by clear and convincing evidence, finding that even if the presumption had been rebutted, "the result would be the same, as Dr. Kyser's opinion outweighs Dr. Montgomery's." Finally, with respect to Employee's wage rate as of the date her initial compensation period ended, the court concluded that Employee had shown by a preponderance of the evidence that she was entitled to increased benefits pursuant to

---

[8] Employee's counsel noted that Dr. Goldin initially was reviewing the wrong patient's report when his deposition began, and certain responses during his deposition testimony were based upon incorrect information.

[9] The court noted that even if serious or substantial doubt about the accuracy of Dr. Goldin's impairment rating had been raised, his opinion is supported by Dr. Kyser's, who treated Employee on thirteen occasions and whose opinion on impairment is presumed correct pursuant to Tennessee Code Annotated section 50-6-204(k)(7).

Tennessee Code Annotation section 50-6-207(3)(B) because she was earning less when her initial compensation period ended than at the time of her injury. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2022). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2022).

**Analysis**

Employer raises two issues on appeal: (1) whether the trial court erred in awarding benefits based on a ten percent impairment rating; and (2) whether the trial court erred in awarding increased benefits under Tennessee Code Annotated section 50-6-207(3)(B). In response, Employee asserts it is within the discretion of the trial court to determine which opinion to accept when presented with conflicting expert medical opinions, and its decision should only be overturned when there is an abuse of discretion. In addition, Employee contends that the trial court correctly found that she was earning a lower wage than her pre-injury wage when her initial compensation period ended.

*Medical Impairment Rating*

Tennessee Code Annotated section 50-6-204(d)(4) provides that when there is a dispute as to the degree of medical impairment, "either party may request an independent medical examiner from the administrator's registry." Further, "[t]he written opinion as to the permanent impairment rating given by the independent medical examiner pursuant to this subdivision (d)(4) shall be presumed to be the accurate impairment rating; provided, however that this presumption may be rebutted by *clear and convincing evidence* to the contrary." Tenn. Code Ann. § 50-6-204(d)(4) (2022) (emphasis added).

7

In considering conflicting expert medical opinions, a court may consider "the qualification of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman v. Williams Sonoma, Inc*., 803 S.W.2d 672 (Tenn. 1991). In addition, it is well-established that, when faced with competing expert medical opinions, "trial courts are granted broad discretion in choosing which opinion to accept, and we will not disturb that decision absent an abuse of discretion." *Jimenez v. Xclusive Staffing of Tenn., LLC*, No. 2016-06-2377, 2017 TN Wrk. Comp. App. Bd. LEXIS 45, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 7, 2017).[10] However, we are also charged with reviewing deposition testimony *de novo*. *See, e.g.*, *Brees v. Escape Day Spa & Salon*, No. 2014-06-0072, 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *16 (Tenn. Workers' Comp. App. Bd. Mar. 12 2015) ("[T]he trial court occupies no better position than this Appeals Board in reviewing and interpreting documentary evidence."). Further, when the trial court's determination is challenged on appeal, we must determine where the preponderance of the evidence lies. *See* Tenn. Code Ann. § 50-6-239(c)(7). Thus, in considering these various standards of review, we have previously concluded that, in circumstances where a trial court has weighed expert medical opinions contained in depositions, the trial court has discretion to accredit the expert opinion it believes offers the more probable explanation. We then consider whether the preponderance of the evidence as a whole, including lay testimony and other evidence, weighs in favor of the trial court's determination. *See Moore v. Beacon Transport, LLC*, No. 2018-06-1503, 2021 TN Wrk. Comp. App. Bd. LEXIS 39, at *7 n.1 (Tenn. Workers' Comp. App. Bd. Oct. 29, 2021).

Here, the trial court was presented with three expert medical opinions: Dr. Kyser, the authorized treating physician, assigned a ten percent impairment rating; Dr. Montgomery, who conducted an employer's examination, assigned a five percent rating to Employee, apportioning one-half of the rating to the work incident; and Dr. Goldin, the MIRR physician, also assigned a ten percent impairment rating. Employee asserts that both Dr. Kyser's and Dr. Goldin's opinions are entitled to a presumption of correctness. Employer argues that because Dr. Kyser was not selected from a panel, his opinion as to the proper impairment rating is not entitled to any presumption of correctness.

In considering the opinions of these doctors, the trial court first emphasized that Dr. Goldin's impairment is not only presumed accurate but can be rebutted only by clear and convincing evidence. In doing so, the trial court relied on the Tennessee Supreme Court's opinion in *Mansell v. Bridgestone Firestone North American Tire, LLC*, 417 S.W.3d 393 (Tenn. 2013), where the Court explained that the "focus is on the evidence offered to rebut [the MIRR] physician's rating," which should be considered in light of the following factors: (1) a comparison of the specialties of the physicians providing the ratings; (2)

---

[10] A trial court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 348, 358 (Tenn. 2008).

whether there is a disagreement as to the employee's diagnosis; and (3) whether the MIRR provider "used an incorrect method or an inappropriate interpretation" of the AMA Guides. *Id.* at 410-411. The Court then concluded that "if no evidence has been admitted which raises a serious and substantial doubt about the evaluation's correctness, the MIRR evaluation is the accurate impairment rating." *Id.* at 411.

Here, Employer argues that Dr. Goldin was unable to conclude within a reasonable degree of medical certainty what percentage of Employee's impairment was directly attributable to the work incident and that, as a result, his written report was invalid because he could not provide an opinion to a reasonable degree of medical certainty. Conversely, Employee asserts that Dr. Goldin testified that he initially reviewed the wrong patient's file in preparation for his deposition and, as such, "during questioning about traumas [Employee] endured both before and after the robbery, Dr. Goldin responded as though Employer's counsel was presenting new information." Employee further argues that, ultimately, Dr. Goldin acknowledged during his deposition that he was aware of Employee's other psychiatric stressors and had the necessary information to determine Employee's impairment rating under the AMA Guides within a reasonable degree of medical certainty. In addition, Employee stresses that Dr. Goldin did not at any time during the course of his deposition change his rating. Dr. Goldin further testified that only traumas prior to the work incident were to be considered in apportionment calculations.

Dr. Kyser, as Employee's authorized physician, evaluated and treated Employee over an extended period of time. Utilizing the same methodology as Dr. Goldin, he also assigned a ten percent impairment rating and testified to a reasonable degree of medical certainty that Employee's PTSD and resulting impairment were more than fifty percent caused by the work incident. Moreover, the statutory language that accords a presumption of correctness to the impairment rating assigned by a "treating physician" pursuant to Tennessee Code Annotated section 50-6-204(k)(7) does not contain the same limitation as the presumption of correctness accorded a panel-selected physician's opinion on causation under Tennessee Code Annotated section 50-6-102(12)(E). Thus, we conclude the trial court did not err in determining that both Dr. Kyser's and Dr. Goldin's impairment ratings were entitled to their respective statutory presumptions of correctness.

Conversely, Dr. Montgomery's opinion regarding permanent impairment is eligible for no statutory presumption of correctness. He testified that he reviewed the psychiatric records of Dr. Kyser, psychotherapy records, a newspaper article, social media postings, and a case management note prior to his evaluation of Employee. He testified to the different stressors Employee had described to him both before and after the work incident. When asked whether he allocated any of the five percent rating he assigned to prior or subsequent traumatic events, Dr. Montgomery testified:

> Yes. It's always important to consider other pre-existing conditions or other causal factors when evaluating someone. In her case, there have been

9

numerous other traumatic events that she has experienced, both before and after [the work incident]. Many of them life threatening. And other situational factors, financial issues, other things that continue to affect her overall psychiatric condition.

She also had . . . gotten treatment for psychiatric conditions prior to this work incident happening. Both got treatment postpartum and also got treatment after her cancer diagnosis. So this is not something new for her. It's not as if she never had any psychiatric treatment before.

So while I think that the incident at work, the robbery, was traumatic and did cause her some degree of psychiatric impairment, I don't think it is logical for one to conclude that that is the sole cause of all her psychiatric symptoms and impairments.

So for that reason, I apportioned her impairment rating by 50 percent. Fifty percent being due to the work-related incident and 50 percent [due] to all the other factors in her life.

When asked to explain the concept of apportionment, Dr. Montgomery testified that apportionment is "a means of making a determination about causation where causation may be from multiple causes." With respect to how such a determination is made, the following colloquy occurred during Dr. Montgomery's deposition:

Q: Okay. Do you know if the American Medical Association, 6th Edition, provides specific instructions about how to undertake an apportionment analysis?

A: Yes.

Q: Okay. Describe that process to me.

A: The guides recommend that you – you rate somebody for each condition or each causation factor that you think is present and then do some mathematical equation to reconcile the two.

Q: Okay. Do you know what that mathematical equation is?

A: Well, depending on what percentages, yes. If you said, you know, 20 percent was from this or 50 percent was from that, then you assign what you think is the apportionment and then adjust the ratings in proportion to that.

Employee asserts that the trial court was correct in noting that Dr. Montgomery improperly considered traumas following the work incident in his apportionment calculations; therefore, Employee argues that Dr. Montgomery's impairment analysis must be disregarded.[11]

Here, it is evident that the trial court considered the specialties and qualifications of the three medical providers. The court noted that all three physicians agreed that Employee's PTSD was primarily caused by the work incident. Further, there is no indication that Dr. Goldin used an incorrect method or an inappropriate interpretation of the AMA Guides when calculating his impairment rating. In short, Employer has not provided clear and convincing evidence rebutting the impairment rating assigned by Dr. Goldin as the medical impairment registry physician, which is Employer's burden under Tennessee Code Annotated 50-6-204(d)(4). Our review of the record leads us to conclude that the trial court did not abuse its discretion in weighing the expert medical evidence and in determining which medical opinion to accept as the most reliable. We further conclude the preponderance of the evidence supports the trial court's determination that Employee retains a ten percent permanent partial impairment causally related to the work incident.

*Entitlement to Increased Benefits*

Turning to Employer's second issue, we conclude the trial court did not err in its analysis of Employee's eligibility for increased benefits. An employee may be entitled to increased permanent partial disability benefits if the original compensation period ends and "the employee has not returned to work with any employer or has returned to work and is receiving *wages or a salary* that is less than one hundred percent (100%) of the wages or salary the employee received from the employee's pre-injury employer on the date of injury." Tenn. Code Ann. § 50-6-207(3)(B) (2022) (emphasis added). In such circumstances, if the court deems it "appropriate," the injured employee's award shall be increased by multiplying the original award by 1.35. *Id.* As we noted in *Marshall v. Mueller Company*, No. 2015-01-0147, 2016 TN Wrk. Comp. App. Bd. LEXIS 74 (Tenn. Workers' Comp. App. Bd. July 11, 2016), the question we must address is what wages Employee was earning at the time of her injury and what wages she was earning as of the date her original compensation period ended.

---

[11] Although we agree that apportionment, as that term is used in the AMA Guides, relates to determining the degree of permanent medical impairment arising from a work-related incident as compared to one or more preexisting impairments, we do not agree that subsequent events are necessarily irrelevant. In cases where a mental injury is alleged, for example, subsequent traumatic events experienced by an injured worker may constitute one or more independent, intervening causes of psychiatric impairment. This is certainly a factor a trial court can consider in the context of causation. Stated another way, pre-existing impairments can be considered by an evaluating physician when apportioning impairment ratings in accordance with the AMA Guides, and subsequent impairing events can be considered by the court in its causation analysis. Both can be relevant and appropriate to consider in any given case, and testimony regarding subsequent traumas may also impact the employee's entitlement to future medical benefits.

In *Corso v. Accident Fund Ins. Co.*, No. M2015-01859-SC-R3-WC, 2016 Tenn. LEXIS 630 (Tenn. Workers' Comp. Panel Sept. 2, 2016), the Tennessee Supreme Court's Special Workers' Compensation Appeals Panel dealt with an issue similar to the one before us. In *Corso*, the injured employee made $14.00 an hour plus overtime prior to his injury, and wage records reflected that, on average, he earned more than $1000 per week. *Id*. at *18-19. After returning to work for the employer, the employee was compensated on a "salary-plus-commission basis" as a sales representative. *Id*. at *19. In that position, he received a base salary of $500.00 per week and earned commissions based on his sales, although he did not receive the commission payments until his employer was paid by the customer. *Id*. at *11. According to the employer, the employee's earnings after he returned to work in his new position were $652.25 per week. *Id*. at *19. In considering whether the employee had returned to work at a wage equal to or greater than the wage he was receiving at the time of the injury, the Court noted:

> [T]he terms "wage" and "average weekly wage" are not synonymous. Average weekly wage is defined as "the earnings of the injured employee in the employment in which the injured employee was working at the time of the injury during the period of fifty-two (52) weeks immediately preceding the date of the injury divided by fifty-two (52) . . . ." It includes amounts such as overtime, bonuses, and commissions in addition to the employee's regular pay. In contrast to the term "average weekly wage," however, the legislature used the term "wage" in determining the amount of temporary partial disability benefits available to an injured employee. When the legislature uses specific language in one section of a statute but omits that language in another section of the same act, we must presume that the legislature acted purposefully in including or excluding that particular language. The term "wage" is also used in determining the maximum award of permanent partial disability benefits available to an employee . . . who suffers an injury to the body as a whole. Based upon our reasoning in *Wilkins*[ *v. The Kellogg Co.*, 48 S.W.3d 148 (Tenn. 2001)], we must conclude that the term "wage" in [section] 50-6-241 does not mean "average weekly wage." Instead, the wage of an employee who is compensated on an hourly basis is the employee's hourly rate of pay.

*Id.* at *19-21 (internal citations omitted) (citing *Powell v. Blalock Plumbing & Elec. & HVAC, Inc.*, 78 S.W.3d 893, 896-97 (Tenn. 2002). Based on this rationale, the Court concluded that the "correct[] 'apples to apples' comparison for purposes of determining whether [an employee] returned to work at a wage equal to or greater than the wage he was receiving prior to his injuries is between the 'base pay' of the two jobs." *Id.* at *21. The Court further determined that what the employee anticipated making in each of the positions was critical in evaluating whether he had returned to work at a lesser wage, noting that he could only anticipate making $500 per week without regard to commissions in his new job, whereas he could anticipate making $560 a week in his original job without regard

to overtime. *Id*. Thus, when comparing an employee's pre-injury wages with his or her wages as of the end of the initial compensation period, the critical question is whether the base rate of compensation is higher or lower.

Here, Employee earned and could anticipate making $990.38 per week with Employer at the time of the work incident, regardless of hours worked. At the time her original compensation period ended, however, she could anticipate making only $880 per week at HCA, without regard to overtime. Consequently, utilizing the "apples to apples" comparison addressed in *Corso*, we discern no error in the trial court's conclusion that Employee proved by a preponderance of the evidence that she was earning less than 100% of the wages she earned at the time of her work injury and, therefore, is entitled to increased benefits pursuant to section 50-6-207(3)(B).[12]

**Conclusion**

For the foregoing reasons, we affirm the trial court's order and certify it as final. Costs on appeal are taxed to Employer.

---

[12] In relation to the evidence submitted that Employee was operating a consulting business and obtained a Paycheck Protection loan, indicating other potential sources of income, Employee testified that the business was in operation from December 2020 to June 2021, which was prior to the expiration of the initial benefit period. Employee's testimony on this issue was unrefuted.

13



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Savitri Matthews | ) | Docket No. 2021-06-1175 |
| | ) | |
| v. | ) | State File No. 118458-2019 |
| | ) | |
| Family Dollar Stores | ) | |
| of Tennessee, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Kenneth M. Switzer, Chief Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 22nd day of August, 2023.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Tiffany B. Sherrill | | | | X | tbsherrill@mijs.com kebozarth@mijs.com |
| Jonathan May | | | | X | jmay@forthepeople.com rorsland@forthepeople.com |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Matthew Keene
Acting Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-532-1564
Electronic Mail: WCAppeals.Clerk@tn.gov